# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL CHARLES DeFRAIA**, <br><br> Plaintiff, <br><br> v. <br><br> **CENTRAL INTELLIGENCE AGENCY**, <br><br> Defendant. | Case No. 1:16-cv-01862 (TNM) |

## MEMORANDUM OPINION

The Plaintiff in this case, Daniel DeFraia, seeks specific records under the Freedom of Information Act related to the Central Intelligence Agency's former detention and interrogation program. The requested records have been separated into two categories, and both parties have moved for partial summary judgment on the first category, as the CIA continues to process and produce records from the second. I conclude that the CIA is entitled to partial summary judgment, because the parties have agreed to narrow the FOIA requests at issue to specified contracts and the records "cited in" a specified Senate committee report, and the CIA has produced all of the required records in those agreed-upon sets.

## I. BACKGROUND

In December 2014, Mr. DeFraia sent the CIA a FOIA request seeking "a) all CIA contracts with Bruce Jessen, b) all CIA contracts with James Mitchell, c) contract information between Jessen and Mitchell, d) contracts between the CIA and Mitchell, Jessen[,] and AMP Associates, and e) [] all information related to [] Jessen and [] Mitchell and their interaction with detainees including interrogation." Compl. 4; Decl. of Antoinette Shiner, Def.'s Mot. Summ. J. Ex. 1, Exhibit A at 25, ECF No. 16-1 (the 2014 Request). "Dr. James Mitchell and Dr. Bruce Jessen were contractors employed by the CIA to assist in interrogating CIA detainees under the

CIA's former detention and interrogation program." Shiner Decl. ¶ 26. In May 2015, Mr. DeFraia sent another request asking for five categories of records that had been "cited in" or "stated in" the declassified portion of the report of the Senate Select Committee on Intelligence on that program. Shiner Decl. Ex. H, ECF No. 16-1 at 40 (the 2015 Request); *see also* Report of the Senate Select Committee on Intelligence Study of the CIA's Detention and Interrogation Program (Senate Report), *available at* https://www.intelligence.senate.gov/sites/default/files/documents/CRPT-113srpt288.pdf (last visited April 26, 2018). Having received no documents in response to either request, Mr. DeFraia filed suit in September 2016.

In a Joint Status Report submitted in December 2016, the parties informed the Court that "[w]ith respect to the first category of records sought [in the 2014 Request], the parties have agreed to refine the scope of the request as seeking contracts between (1) the CIA and (2) Bruce Jessen and/or James Mitchell and/or Mitchell Jessen & Associates from 2001-2009 that relate to the CIA's rendition, detention, and interrogation program." ECF No. 7 at 2 (Joint Status Report). Both sides agreed to exclude a laundry list of sensitive information "from Defendant's initial production of records responsive to this category," such as the names and contact information of CIA personnel. *Id*. at 2-3. The CIA had already produced these exact documents for another litigation,[1] and so anticipated providing responsive records within two weeks, after which the Plaintiff "reserve[d] the right to request that CIA produce certain redacted material." Joint Status Report at 3. As for the 2015 Request, "the parties [] agreed that the request will be processed as written." *Id*.

---

[1] Shiner Decl. ¶¶ 20-21 ("In short, the plaintiff agreed to waive processing under the FOIA in exchange for the CIA's agreement to produce a copy of what had been produced in the *Salim* case.").

After productions from the CIA, both parties filed motions for summary judgment on the first portion of the 2014 Request and the full 2015 request. Mem. In Support of Def.'s Mot. Summ. J. (Def.'s Mot. Summ. J.) at 1-2, ECF No. 15; Mem. In Support of Pl.'s Mot. Summ. J. (Pl.'s Mot. Summ. J.), ECF No. 19. Production on the second portion of the 2014 Request is ongoing. *See* Order, ECF No. 28 at 1-2 (setting a production schedule that ends on June 29, 2018).

## II. LEGAL STANDARDS

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). The FOIA requires federal agencies to "disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365-66 (D.C. Cir. 2008); *see also* 5 U.S.C. § 552(a)(3)(A) (records sought must be "reasonably describe[d]"). Thus, a FOIA defendant is entitled to summary judgment if it demonstrates that there is no genuine dispute as to whether "each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). The "vast majority" of FOIA cases are decided on motions for summary judgment. *See Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

Searching for records requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. Dep't of Justice*, 349 F.3d 657, 662 (D.C. Cir. 2003). To demonstrate the reasonableness of its search, an agency can submit a

3

"reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. Agency declarations are given "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991). "[S]ummary judgment . . . is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

### III. ANALYSIS

The CIA contends that it has fully complied with its pertinent FOIA obligations, supported by a declaration from Ms. Antoinette Shiner, the Information Review Officer for the CIA's Litigation Information Review Office. Def.'s Mot. Summ. J. Ex. 1 (Shiner Decl.). But Mr. DeFraia argues that the CIA's description of its search methodology is legally inadequate, and that the CIA has failed "to follow-up on clear leads indicating the existence of additional [responsive] agency records." Pl.'s Mot. Summ. J. at 9; Supp. Decl. of Daniel DeFraia, Pl.'s Mot. Summ. J. (Supp. DeFraia Decl).[2] He also asks for *in camera* review to verify that the CIA has properly invoked two FOIA exemptions. Pl.'s Mot. Summ. J. at 13-15. Based on the governing language of Mr. DeFraia's requests, I conclude that the CIA has provided every legally required record, and that no basis exists for *in camera* review of the CIA's work.

---

[2] Mr. DeFraia's first declaration was filed in support of his opposition to the CIA gaining an extension of time to move for summary judgment. Decl. of Daniel DeFraia, Mem. In Opposition to the CIA's Motion for Extension of Time (DeFraia Decl), ECF No. 10-1 (March 6, 2017).

## A. The CIA Has Produced the "Contracts" Listed in the 2014 Request

The parties have expressly agreed, in a document signed by attorneys for both sides, that the scope of the first portion of Mr. DeFraia's 2014 Request is limited to "contracts between (1) the CIA and (2) Bruce Jessen and/or James Mitchell and/or Mitchell Jessen & Associates from 2001-2009 that relate to the CIA's rendition, detention, and interrogation program," with specific, agreed-upon redactions. Joint Status Report at 2. Immediately after the parties agreed to this narrowed scope, the CIA produced all of the CIA contracts at issue. Shiner Decl. ¶ 22. The contracts were redacted as specified in the Joint Status Report, and the CIA invoked no additional exemptions. *Id*.

Mr. DeFraia still wants to enforce the scope of his original 2014 Request, which was somewhat broader, and he therefore demands "additional documents" to which the contracts "directly refer." Pl.'s Mot. Summ. J. at 10 ("[t]he portion of the . . . 2014 Request at issue herein sought "*all* contract information"). But it is the Joint Status Report, not Mr. DeFraia's original request, that controls. 5 U.S.C. § 552(4)(A)(viii)(II)(bb), (6)(B)(ii) (both referring to a FOIA requestor's ability to later "limit the scope of the request"); *Gilman v. U.S. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 22 (D.D.C. 2014) (enforcing "[t]he plain meaning of the joint status report" to conclude that certain documents "are not responsive to the plaintiff's amended FOIA request").[3]

When confronted with this objection, Def.'s Opp. at 8-9, Mr. DeFraia does not squarely challenge the binding nature of this agreement, but argues that a contracts-only interpretation of the Joint Status Report "ignores DeFraia's retained right to challenge [the CIA's] withholdings

---

[3] Even Mr. DeFraia's original motion seems to acknowledge the binding nature of his agreement, saying that "pursuant to the provisions of the [Joint Status Report], Plaintiff challenges the adequacy of [the] CIA's production of records." Pl.'s Mot. Summ. J. 10.

5

as inadequate within the context of these proceedings." Pl.'s Reply at 5. Under the plain language of the agreement, that right does not extend beyond the specified contracts. The Joint Status Report defines the "scope of the [2014] Request" as specific "contracts," and immediately explains that certain information will be redacted from those "records . . . with the understanding that Plaintiff does not waive the right to seek copies of these records that may include some of the redacted information in the agency's subsequent record releases or in this action." Joint Status Report at 2. The agreement goes on to say that the CIA will produce "*records* responsive to this category," and "[a]fter reviewing *those records* in their redacted form, Plaintiff reserves the right to request that CIA produce certain redacted material." *Id*. at 3 (emphases added). The only reasonable interpretation of this language is that Mr. DeFraia has retained a right to ask the CIA to produce materials redacted from the listed contracts—the "records" to which the agreement repeatedly refers—and nothing further. In other words, we are only dealing with specified "contracts." *Id*. at 2-3.

Because Mr. DeFraia has already narrowed the scope of his FOIA request, his assertion that the CIA failed "to follow-up on clear leads indicating the existence of additional agency records" must fail. *See* Pl.'s Mot. Summ. J. at 9. Mr. DeFraia points to five sets of documents referenced in the CIA contracts, which he says are illustrative of "obvious indications that [the] CIA omitted responsive records." *Id*. at 11. But none of those documents constitute a contract— or part of a contract—that the CIA has failed to produce.

A contract, in simple terms, consists of mutually agreed-upon words that create obligations. *See Contract,* Black's Law Dictionary (10th ed. 2014) ("An agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law . . . [or] [t]he writing that sets forth such an agreement."). In Mr. DeFraia's first example, he points

to 11 "applicable documents" listed in a 2005 "Statement of Work," which he claims "were to be integral outlines and guides of contract performance." Pl.'s Mot. Summ. J. at 11; *Id*. Ex. 2 at 6. But the "Applicable Documents" that the contract lists amount to independent rules and guidebooks for working for the CIA, not part of the obligation-creating contract language itself. Pl.'s Mot. Summ. J. Ex. 2 at 6 (listing, among other things, a "Contractor Classification Guide," a "National Industrial Security Program Operating Manual," and a CIA "Directive" on "Protecting Sensitive Compartmented Information with Information Systems."). The 2005 Statement of Work also listed various deliverables that the contractors would provide, including "six reports or categories of reports," a "Management Plan," a "Concept of Operations," "quarterly technical reports," and "monthly financial reports." Pl.'s Mot. Summ. J. at 11-12. Mr. DeFraia also thinks these deliverables should have been produced. But deliverables are the fruit of an obligation, not obligation creators themselves, and are therefore distinct from the contract as such.

  Mr. DeFraia's second example does include actual contract language, but the CIA has already produced it. He points to "a Statement of Work from the CIA Contracting Officer to Dr. James Mitchell, dated 8 August 2001," Pl.'s Mot. Summ. J. at 12, which states that the CIA in "Appendix A" will "provide a list of specific variables to be included" in completing Project Objective Task I (an assessment of "methods and strategies" for conducting psychological assessments in difficult situations). Supp. DeFraia Decl. Ex. 4 at 2; *see also* Pl.'s Reply at 5 (claiming that "at least" this document counts as part of a contract, under a contracts-only reading of the Joint Status Report). On April 3, 2018, I issued an order requiring the CIA to produce Appendix A or explain why release was not required. Order, ECF No. 33. On April 18, 2018, the CIA filed a Notice of Compliance with this Order, explaining that Appendix A had

already been produced, and providing a copy to the Court. ECF No. 35. Thus, Mr. DeFraia's objections regarding the 2001 Statement of Work have been satisfied.[4]

Mr. DeFraia's third, fourth, and fifth examples all point to "deliverables" that these contracts required. Pl.'s Mot. Summ. J. at 12-13. But a party can produce a contract for apples, in full, without handing over a single apple, because the deliverables are not part of the contract itself. Accordingly, the CIA has produced all the records that Mr. DeFraia requested under the first part of his 2014 Request, fully complying with its obligations under FOIA.

**B. The CIA Has Produced the Required Records From the 2015 Request**

The result in the 2015 Request is similarly controlled by the language of Mr. DeFraia's request. That request sought five categories of records that had been "cited in" or "stated in" a certain Senate Report. Shiner Decl. Ex. H at 40. The CIA has identified 13 documents in those five categories, withholding one document in full and producing the remaining 12 with redactions under several claimed FOIA exemptions. Shiner Decl. ¶ 23.

Mr. DeFraia argues that the CIA ignored "clear leads that additional documents exist," pointing to specific language in the fourth sub-heading of his 2015 Request. Pl.'s Mot. Summ. J. at 10. But the language does not back up his claim. In that request, Mr. DeFraia sought "[a]ll emails, letters, and reports, and other sources of information cited in footnote 1029, 1030, and 1031 of the Senate . . . [R]eport[,] especially information related to the July 25, 2006 'Justification For Other Than Full and Open Competition, Contractor.'" Shiner Decl. Ex. H. Mr. DeFraia emphasizes that he sought "all . . . sources of information cited" in the three footnotes, "especially information related" to the 2006 "Justification" document. Pl.'s Mot.

---

[4] Mr. DeFraia also points to other deliverables listed in the 2001 Statement of Work, but those documents are not part of the contract itself, for the reasons explained above. *See* Pl.'s Mot. Summ. J. at 12.

8

Summ. J. at 10. On this basis, Mr. DeFraia would have the CIA produce information that was *not* specifically cited in the footnotes, undertaking "follow-up search actions to locate the relevant records and files associated with [the] Justification." *Id*. But to look for information not cited would go beyond the request, which sought "[a]ll emails, letters, and reports, and other sources of information *cited* in" three specific footnotes. Shiner Decl. Ex. H. It is true that Mr. DeFraia "especially" requested information related to the Justification, but "especially" modified his "request" for "sources of information . . . *cited*." *Id*. (emphasis added). By giving him documents "cited in" the footnotes, the CIA gave Mr. DeFraia exactly what he requested.[5]

### C. *In Camera* Review is Not Warranted

Mr. DeFraia only challenges the CIA's invocation of four FOIA exemptions for the 2015 Request by asking for *in camera* review. Pl.'s Mot. Summ. J. at 13-14. In fact, he does not challenge the CIA's invocation of Exemption 1, for information that has been "properly classified," *Morley*, 508 F.3d at 1123 (citing 5 U.S.C. § 552(b)(1)), or Exemption 3, for material "specifically exempted from disclosure by statute," 5 U.S.C. § 552(b)(3).[6] Pl.'s Mot. Summ. J. at 13. Instead, Mr. DeFraia asks me to review seven specific documents, challenging the CIA's withholdings on the basis of FOIA Exemptions 5 and 6. *Id*. at 14. He explains that *in camera*

---

[5] Mr. DeFraia also raises a global objection to the CIA's motion for summary judgment, arguing that the CIA never described its pre-litigation search processes, and did not adequately explain how it went about finding the documents it has produced in response to either request. Pl.'s Mot. Summ. J. at 6-9. But search requirements do not exist in a vacuum. Instead, "[t]o prevail on summary judgment . . . the defending agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation marks and citation omitted). Because the universe of "relevant documents" is relatively narrow in this case, and the CIA has shown beyond material doubt that it has in fact uncovered them all, no further specificity is required.

[6] For Exemption 3, the CIA invokes the National Security Act of 1947, and the Central Intelligence Agency Act of 1949. Def.'s Mot. Summ. J. at 16-17.

review will help me to "quickly determine whether [the] CIA has accurately and adequately identified the redacted information in [its] *Vaughn* index," and adequately segregated non-exempt information. *Id*. at 14-15. He argues that such review is "particularly appropriate" here, where "the agency's declarations are insufficiently detailed . . . the number of documents to review is quite small, and . . . the dispute turns on the contents of the documents themselves." *Id*. at 15 (citations omitted).

But the mere possibility of error does not warrant *in camera* review. *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 22 (D.C. Cir. 1984). As part of its required *de novo* review, a court "*may* examine the contents of . . . agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B) (emphasis added). "[D]istrict courts have substantial discretion" in deciding whether to review documents *in camera*, *Ctr. for Auto Safety*, 731 F.2d at 21, and "[t]he ultimate criterion is simply . . . [w]hether the district judge believes that in camera inspection is needed in order to make a responsible *de novo* determination on the claims of exemption." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). Here, reviewing the claimed exemptions *de novo*, I conclude that the CIA's affidavit contains enough detail to satisfy the legal standard. Shiner Decl. ¶¶ 24-42; *Military Audit Project*, 656 F.2d at 738 ("summary judgment . . . is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.").

Mr. DeFraia raises two arguments that this standard remains unmet, to no avail. With respect to the CIA's invocation of Exemption 5 for pre-decisional, deliberative material, *see* 5 U.S.C. § 552(b)(5), Mr. DeFraia points out that the CIA has invoked this exemption for four

documents without "pinpoint[ing] an agency decision . . . to which the document contributed," *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987), and without much description of those documents. Pl.'s Reply at 7; *see* Shiner Decl. ¶¶ 38-40. But the CIA has identified these documents with some specificity, as "MJA Monthly Report February 2006," "MJA Monthly Report March 2006," an "email between Agency employees, Subject: Next Contractual Steps with Mitchell & Jessen," and a second "Email between Agency employees." Def.'s Mot. Summ. J. Ex. 2 at Entry Nos. 7, 10, 12, and 13 (*Vaughn* Index); Shiner Decl. ¶¶ 39-40 (referring to the same items as Documents C06673769, C06673772, C06674722, and C06674723). The last email, which was withheld in full under Exemptions 1, 3, and 5, "includes comments and recommendations, and as well as discussions about proposals, potential resource allocation, and other deliberative ancillary matters." Shiner Decl. ¶ 40. In this context—"the CIA's former detention and interrogation program," where "[t]he focus of the program was to collect intelligence from high value detainees, such as senior al-Qaida members and other terrorists thought to have knowledge of active terrorist plots to murder American citizens," *id*. at 26—Ms. Shiner's bland description is reasonably specific, and indeed seems wise. This program obviously "implicat[ed] national security, a uniquely executive purview," where "both the Supreme Court and this Court have expressly recognized the propriety of deference to the executive in the context of FOIA claims." *Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926–27 (D.C. Cir. 2003). Any additional specificity about the specific "proposals" or "resource allocation" decisions under consideration might well be unreasonable in this context, and Mr. DeFraia points to no "contrary

evidence in the record nor . . . evidence of agency bad faith." *Military Audit Project*, 656 F.2d at 738.

Mr. DeFraia also suggests that the CIA may have invoked Exemption 6 to shield "non-CIA personnel," Pl.'s Mot. Summ J. 13-14, and that Ms. Shiner's declaration on this point is "boilerplate language parroting the standard of FOIA Exemption 6." Pl.'s Reply 8 (quoting *Pinson v. U.S. Dep't of Justice*, 160 F. Supp. 3d 285, 300 (D.D.C. 2016) ("other than providing boilerplate language . . . [the Government] does not identify how revealing this individual's identity . . . would result in a clearly unwarranted invasion of this person's personal privacy). But the CIA affidavit does all that can be expected here. Ms. Shiner invokes Exemption 6 *only* to "withhold CIA officer's names," Shiner Decl. ¶ 41, and does so after explaining in detail why "the CIA does not ordinarily disclose the identity and Agency affiliation of its employees, regardless of whether or not they are under cover." *Id*. ¶ 28.[7] I find that no justification exists for reviewing any documents *in camera* for compliance with Exemption 6.

In sum, I conclude that the CIA has complied with its obligations under FOIA, leaving no genuine dispute on a question of material fact, and that *in camera* review of even a small number of documents is not necessary to accomplish a responsible *de novo* review.

---

[7] "Such employees may have served in sensitive positions or been involved in sensitive operations, may be doing so now, or may do so in the future. The CIA undertakes substantial efforts to protect its officers from exposure that could compromise their safety and the CIA's intelligence gathering mission. Revealing the names of those individuals who were involved in the program would likely jeopardize the safety of these officers and their families, and potentially the human intelligence sources who have met with these officers over the course of their careers. Additionally, future officers may be less willing to accept dangerous job assignments if the CIA is unable or unwilling to protect their identities, significantly impairing the CIA's ability to conduct its clandestine intelligence mission." *Id*.

## IV. CONCLUSION

For the reasons stated above, the CIA's Motion for Partial Summary Judgment will be granted, and Mr. DeFraia's Motion for Partial Summary Judgment will be denied. A separate order will issue.

Dated: April 30, 2018

TREVOR N. MCFADDEN
United States District Judge